UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


NANCY SEAMAN,

      Petitioner,                          Civil Action No. 08-CV-14038

v.                                      HON. BERNARD A. FRIEDMAN

HEIDI WASHINGTON,

      Respondent.

                       /

## OPINION AND ORDER GRANTING CONDITIONAL WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY

Michigan state prisoner Nancy Seaman seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] In her application, Petitioner challenges her first-degree murder conviction. She argues that habeas relief should be granted for the following reasons: the trial court erred in denying an evidentiary hearing on her ineffective assistance of counsel claim, the prosecutor committed misconduct, misleading jury instructions violated due process, her right to present a defense was violated, trial counsel was ineffective, the jury's verdict was against the great weight of the evidence, and the accumulation of errors violated due process. For the reasons contained in this opinion, the Court conditionally grants the petition.

---

[1] The petition was filed *pro se*. The Court subsequently granted Petitioner's motion for appointment of counsel and Petitioner is now represented by counsel.

# I. Background

Petitioner's conviction arises from the murder of her husband Robert Seaman at their home in Farmington Hills, Michigan, on the morning of May 10, 2004. His body was discovered by police officers responding to a missing person report. The body was located in the trunk of Petitioner's vehicle. The medical examiner testified that the autopsy showed injuries consistent with Mr. Seaman having been struck on the head and neck with a hatchet at least 16 times, slashed with a knife on the neck, stabbed at least 21 times, and struck on the forehead with a blunt object.

The defense did not dispute that Petitioner killed her husband. The defense argued that she did so in self-defense. Specifically, the defense maintained that for many years Petitioner had been abused emotionally and physically by her husband. As a result of this persistent and prolonged trauma, the defense argued that Petitioner suffered from battered spouse syndrome. Petitioner testified that at the time she killed her husband she feared he would kill her because he had recently learned that she planned to leave him and move into a condominium she had purchased months earlier.

According to Petitioner's testimony, the morning of the killing unfolded as follows: She walked into the kitchen to prepare her lunch before leaving for her teaching job at an elementary school when she saw Mr. Seaman seated at the counter. It was unusual for him to be awake at that early hour. Mr. Seaman was clearly angry with her and told her that he knew she had purchased a condominium and was planning to leave him. He threw her against the refrigerator and threatened to kill her. After releasing her, he continued to yell at her. He picked up an 8"-long knife that had been on the counter and fiddled with it while he continued yelling. Petitioner, intending to leave for work and to defuse the situation, reached for her purse and coffee mug. As she did so, Mr. Seaman

dragged the knife across her hand, cutting her.

Petitioner testified that she was extremely fearful Mr. Seaman would harm her further. She attempted to leave the house through the front door, but realized she was locked in because the key was missing from the dead bolt. She then ran to the garage and attempted to press the button to open the garage door. Before she could do so, she was shoved from behind with sufficient force to send her sprawling on the garage floor. Petitioner testified that she cowered on the floor, attempting to protect her head and face. Mr. Seaman screamed at her while pacing back and forth in the garage. Petitioner remained on the floor in a defensive position until Mr. Seaman approached her again. She attempted to rise. Mr. Seaman grabbed her leg. She reached on top of a generator to try to obtain leverage. She testified that she felt the handle of a hatchet, picked it up and swung the hatchet at her husband's face. She had purchased the hatchet the night before. She testified that she purchased the hatchet to perform some deferred yard work.

Petitioner testified that she continued to swing the hatchet, but did not know how many times she did so. She testified that she was terrified and believed that if Mr. Seaman got his hands on her he would kill her. After hitting him with the hatchet, she grabbed the kitchen knife from the garage floor and stabbed Mr. Seaman. Mr. Seaman lay motionless on the garage floor. Petitioner fled to her bedroom. She believed that Mr. Seaman might follow her.

Eventually, Petitioner attempted to arrange for a substitute teacher to cover her class that day. She was unable to find a substitute, so she showered, dressed and drove to school. She testified that her appearance was quite disheveled that day. After school, she went to a store to purchase cleaning agents. She knew that her son, Jeff, would be coming to the house at some point and she did not want him to see his father or evidence of what had transpired. That evening, she wrapped Mr.

Seaman's body in a tarpaulin along with the hatchet.  She cleaned the entire garage with bleach and repainted portions of the garage to hide the blood.  She then went to bed.

The next morning, Tuesday, May 11, 2004, Petitioner looked into the garage from the house and, when she saw how clean the garage was, felt like she had fixed everything.  She went to school that day to teach.  After school, she felt that she needed to go to Home Depot to return a hatchet because she believed that if there was no hatchet the killing could not have happened.  She did not have a hatchet to return, so she took a hatchet from the store shelves and returned that hatchet.

Petitioner also testified as to various lies she told to the police, her children, and acquaintances about Mr. Seaman's whereabouts in the days before his body was discovered in the trunk of his vehicle.

The prosecution argued that the killing was planned.  Central to this theory of the case was that, the evening before the murder, Petitioner went to Home Depot and purchased the hatchet.  Petitioner testified that she purchased the hatchet in anticipation of completing desperately needed yard work, specifically that the hatchet would be used to trim tree branches and remove tree stumps.  The defense presented evidence that Petitioner and her husband had a long-running dispute about who bore responsibility for upkeep of the home.  As a result, the yard was not maintained, bushes and shrubs were untrimmed, trash was not taken to the curb, and the home, particularly the exterior, was in a state of disrepair.

Nancy and Robert Seaman's two children, Greg and Jeff Seaman, testified at the trial.  Jeff testified for the prosecution, Greg for the defense.  Although their testimony was generally consistent regarding many aspects of their parents' lives, it differed in one key respect:  Jeff testified that he never saw any evidence that his mother was an abused spouse, while Greg testified that his

father abused his mother verbally and, occasionally, physically. Jeff testified that he had a very good relationship with both of his parents and described his father as his best friend. He testified that, beginning approximately three to four years before Mr. Seaman's death, his parents had a continuing dispute about the care and upkeep of the interior and exterior of their home. Consequently, the grass was unmown for an entire summer, one of the garage doors was broken and remained unfixed, the furnace and central air conditioning unit did not work properly, and trash piled up in the garage because neither parent would take it to the curb. Jeff testified that he was skeptical of his mother's accounts of abuse.

In contrast, Greg testified that he witnessed almost constant verbal abuse by his father toward his mother. He also witnessed physical abuse. He saw his father shove his mother on a couple of occasions. His relationship with his father suffered over the years and, about one year before his father's death, the relationship deteriorated further because he confronted Mr. Seaman about Mr. Seaman's treatment of his mother. Greg was aware that his mother planned to leave Mr. Seaman and had purchased a condominium for that purpose. He testified that his mother had told him not to tell Mr. Seaman about the condominium because she feared he would kill her if he found out.

William Smith, the former principal of the elementary school where Petitioner taught, testified that Petitioner had a reputation for being a peaceful and non-violent person. He testified that he remembered her having a very severe black eye at some point in the two years preceding Mr. Seaman's death. Several other witnesses who were also employed at Petitioner's elementary school testified that she had a reputation for peacefulness and truthfulness. The head custodian and two other teachers testified that they observed various injuries on Petitioner at times during her employment at the elementary school.

The Court will discuss additional testimony adduced at trial *infra* as necessary.

## II.  Procedural History

Following a jury trial in Oakland County Circuit Court, Petitioner was convicted of first-degree murder.  On January 25, 2005, she was sentenced to life imprisonment.  Petitioner filed a motion for new trial.  On August 31, 2005, the trial court denied the motion, but reduced her conviction to second-degree murder on a finding that the first-degree premeditated murder conviction was not supported by sufficient evidence of premeditation or deliberation.

The prosecutor filed an application for leave to appeal in the Michigan Court of Appeals, raising the following claim:

> The trial judge grossly overstepped his authority when he reduced defendant's jury conviction of first-degree premeditated murder to second-degree murder where the evidence overwhelmingly supported the jury's verdict and where, despite his claims to the contrary, the trial judge acted as the "thirteenth juror."  As such this court should not only reinstate the jury's verdict, but should also order that any further proceedings in the trial court be held before a different judge.

The Michigan Court of Appeals granted leave to appeal.  *People v. Seaman*, No. 265572 (Mich. Ct. App. Apr. 21, 2006).  The court of appeals also consolidated the prosecutor's appeal with Petitioner's appeal of right.  *Id.*

In her appeal of right, Petitioner raised the following claims:

I.      The murder verdict entered in this case is a manifest injustice and it violates the Federal and Michigan due process right to a fair trial because the verdict is against the great weight of the evidence.

II.     The prosecution engaged in multiple and pervasive forms of prosecutorial misconduct, such that the state and federal constitutional right to due process and a fair trial were violated.

III.    Trial counsel was ineffective under the state and federal constitutions for not discovering or presenting certain exculpatory evidence, failing to properly prepare or question Dr. Walker, and failing to object to prosecutorial misconduct and

instructional error. A new trial should have been ordered by the trial court.

IV.    In addition to the errors alleged above, Nancy was denied a due process right to a properly instructed jury, under the Michigan and Federal constitutions where jury instructions were incomplete, confusing and misleading.

V.    The trial court reversibly erred when it refused to grant a mistrial after the prosecutor used rebuttal argument to allege that defendant removed a cover from the hatchet and therefore premeditated, when no evidence was ever submitted that the hatchet had a cover.

VI.    The cumulative effect of the errors denied defendant a fair trial.

The Michigan Court of Appeals reversed the trial court's decision to reduce the first-degree murder conviction to second-degree murder. The state court denied all of Petitioner's claims. *People v. Seaman*, Nos. 260816 & 265572, 2007 WL 466003 (Mich. Ct. App. Feb. 13, 2007). Judge Fort Hood would have affirmed the reduction in sentence. A subsequent motion for reconsideration was denied, with Judge Fort Hood dissenting. Nos. 260816 & 265572 (Mar. 28, 2007).

Petitioner then filed an application for leave to appeal in the Michigan Supreme Court. She presented the following claims:

I.    The trial judge did not abuse his discretion under *Spalding* or *Babcock III* when he acted in a principled manner to try to remedy an unfair trial.

II.    The court of appeals erred in denying defendant an evidentiary hearing on ineffective assistance and related claims she supported and diligently presented below.

III.    The court of appeals erred in denying defendant a new trial on grounds of prosecutor misconduct.

IV.    Defense counsel was ineffective under the Sixth Amendment of the United States Constitution.

V.    Michigan law violates the federal Equal Protection Clause insofar as the defense may not ask a battered spouse syndrome expert to address the specific behavior of the accused.

VI.    Defendant was denied due process under the state and federal constitutions where her

jury instructions were incomplete, confusing, and misleading.

VII. Defendant was denied a fair hearing by the court of appeals, when it clearly misunderstood the facts and issues raised by the defense.

The Michigan Supreme Court denied leave to appeal. *People v. Seaman*, 480 Mich. 888, 738

N.W.2d 736 (Mich. 2007).

In 2008, Petitioner filed a motion for relief from judgment in the Oakland County Circuit

Court, raising the following claims:

I. Trial counsel and appellate counsel were ineffective under the Sixth Amendment of the United States Constitution.

II. Defendant was denied federal due process because Michigan's limitations on expert testimony in cases involving battered woman syndrome violate the defendant's constitutional right to present a defense.

III. Defendant was denied federal due process and the right to confrontation violative of her Fifth, Sixth, and Fourteenth Amendment rights when the prosecutor presented herself as an unsworn expert witness on battered woman syndrome and used the prestige of her office to offer testimony about the syndrome.

IV. Defendant was denied due process in violation of her Fourth, Fifth, and Fourteenth Amendment rights when she was subjected to interrogation and warrantless search prior to *Miranda* rights.

V. Defendant was denied federal due process when jury bias from pretrial exposure made it impossible for defendant to get a fair trial.

VI. The cumulative effect of the errors described herein and in defendant's brief #260816 and #265572 denied defendant a fair trial and was violative of her due process rights.

While her motion for relief from judgment was pending in the Oakland County Circuit Court,

Petitioner filed the instant petition for a writ of habeas corpus, raising all of the claims raised on

direct review in state court. Petitioner also filed a "Motion to Hold Habeas Petition for Writ of

Habeas Corpus By a Person in State Custody in Abeyance." In the motion, Petitioner stated that,

while all of the claims presented in her habeas corpus petition had been exhausted in state court, she wanted to amend the petition to include claims raised in the pending motion for relief from judgment. Petitioner asked the Court to stay the instant petition until those claims were fully exhausted in state court. The Court granted the motion and administratively closed the case.

One month later, Petitioner filed a motion asking the Court to lift the stay, stating that she did not wish to pursue her unexhausted claims in state court or raise those claims in her habeas petition. The Court granted the motion and granted Petitioner's request for appointment of counsel. The Court also granted Petitioner's request for an evidentiary hearing to develop the factual basis for her ineffective assistance of counsel claim. An evidentiary hearing was held on April 21, 2010. The substance of the testimony presented during the hearing will be discussed *infra*.

Petitioner raises the following claims in her habeas petition:

I. Defendant was denied due process when the court of appeals denied defendant an evidentiary hearing on ineffective assistance and related claims she supported and diligently presented and instead based their ruling on misinterpreted evidence or they ignored some issues completely.

II. Defendant was denied federal due process and a fair trial due to egregious and pervasive prosecutorial misconduct.

III. Defendant was denied federal due process and a fair trial where the jury instructions were incomplete, confusing and misleading.

IV. Defendant was denied federal due process because Michigan's limitations on expert testimony in cases involving battered woman syndrome violate the defendant's constitutional right to present a defense.

V. Trial counsel was constitutionally ineffective under the Sixth Amendment of the United States Constitution . . . for failure to object to all instances of prosecutorial misconduct . . . and for failure to investigate and present evidence for issues discussed in argument I.

VI. The murder verdict in this case is a manifest injustice and it violates the federal due process right to a fair trial because the verdict is against the great weight of the

evidence.

VII.     The cumulative effect of the errors described herein and in defendant's brief #260816 and 265572 denied defendant a fair trial and was violative of her due process rights.

### III.  Legal Standards

28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).  Additionally, this court must presume the correctness of state court factual determinations.  28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case."  *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 410-11.

## IV. Discussion

### A. Ineffective Assistance of Counsel

Petitioner argues that counsel was ineffective for numerous alleged failures. She argues that counsel was ineffective in failing to (1) offer evidence regarding Mr. Seaman's financial condition; (2) elicit testimony that the stab wounds were inflicted post-mortem and that the blunt-force injury was the first injury sustained and would have been incapacitating; (3) introduce a photograph of a knife; (4) investigate the effects of drugs and alcohol on Mr. Seaman's behavior; (5) adequately prepare and examine expert witness, Dr. Lenore Walker, within allowable parameters, (6) object to prosecutorial misconduct; and (7) object to erroneous, misleading and confusing jury instructions.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged test for determining whether a habeas petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. Second, a petitioner must show that counsel's deficient performance prejudiced petitioner. To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A court's review of counsel's performance must be "highly deferential." *Id.* at 689. Habeas relief may be granted only if the state-court decision unreasonably applied the standard for evaluating ineffective-assistance-of-counsel claims established by *Strickland*. *Knowles v. Mirzayance*, __ U.S. __, 129 S. Ct. 1411, 1419 (2009). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard

was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Id.* at __, 129 S. Ct. at 1420 (internal quotation omitted).

### 1. Expert Witness Testimony

Petitioner argues that defense counsel was ineffective in failing to adequately prepare and use expert witness Dr. Lenore Walker at trial. She argues that counsel failed to secure Dr. Walker's independent assessment of Petitioner, leaving Dr. Walker vulnerable to cross-examination on this issue. She further argues that counsel lacked a complete understanding of the full nature and extent of permissible expert testimony regarding battered spouse syndrome under Michigan law. Consequently, counsel failed to argue for the admission of this testimony, leaving the jury without an expert opinion as to whether Petitioner's conduct was consistent with that of someone suffering from battered spouse syndrome.

### a. Preparation and Scope of Trial Testimony

Prior to trial, the prosecutor filed a motion to limit the defense to one expert on battered spouse syndrome because the experts listed (Dr. Lenore Walker and Dr. Michael Abramsky) were, she argued, cumulative. The trial court denied the prosecutor's motion and allowed both witnesses to testify. During the hearing on this motion, a colloquy ensued regarding the scope of permissible expert testimony regarding battered spouse syndrome. The colloquy shows both the trial court's holding and defense counsel's understanding of the issue:

| The Court: | Well, what is [Dr. Abramsky] going to testify to? That he interviewed her, that he submitted her to certain tests, that he did this, and he is not going to come to a conclusion then? He is just going to say, I submitted my findings to this Doctor [Lenore Walker] in Florida? I'm guessing. And then the doctor in Florida can then come up with an opinion based on that? |
|---|---|
| Defense counsel: | But he is also – he is an expert in battered wife syndrome and I was going to ask him, are you familiar with that? I cannot ask him specifics about what my client told him. |
| The Court: | No. |
| Defense counsel: | I'm precluded to do that. |
| The Court: | Right. |
| Defense counsel: | But he can say, this is what battered wife syndrome is; these are some of the symptoms. |
| The Court: | He can't even say that she fits those symptoms. |
| Defense counsel: | No. And Doctor Walker can't testify to that either. |
| The Court: | Right. All he can say is what is a battered woman. |
| Defense counsel: | Right. |
| The Court: | And then it is up to the jury to take a look at her testimony and make a determination, does she fit that description. |
| Defense counsel: | That's my understanding of the law Judge. |

Tr., 11/24/04 at 7-9.

In accordance with the trial court's ruling reflected above, the expert witness testimony offered by the defense at trial was quite limited in scope. Dr. Abramsky was qualified as an expert in battered spouse syndrome. He testified that he met with Petitioner on two separate occasions, reviewed the case file, and performed a battery of psychological tests. He also consulted with Dr. Lenore Walker. He explained battered spouse syndrome, discussing typical patterns battery follows

and the effects on the battered spouse. He did not testify about Petitioner's conduct, psychological tests, or relate in any way battered spouse syndrome to the particulars of Petitioner's case.

Dr. Lenore Walker was the second expert witness to testify for the defense. She was qualified as an expert in clinical and forensic psychology and in battered wife syndrome. Dr. Walker testified at length about the syndrome. She testified about the characteristics of a batterer and of a battered spouse. She explained the cycle of violence typical in such a relationship. Dr. Walker testified that she did not personally meet with Petitioner. She further testified that defense counsel told her that she could not give a personal opinion in the case. She was not asked and did not testify whether Petitioner's actions during the course of her relationship with Mr. Seaman or in connection with the killing were consistent with the actions of someone suffering from the syndrome.

### b. Michigan Court of Appeals' Opinion

The Michigan Court of Appeals held that defense counsel's handling of the expert witnesses was not ineffective:

> [D]efendant alleges that trial counsel was ineffective for failing to properly handle the expert witnesses. Specifically, defendant alleges that the preliminary testing of defendant for battered woman syndrome should have been conducted by Dr. Walker instead of Dr. Abramsky, counsel did not make defendant available to Dr. Walker, and counsel failed to have Dr. Walker testify regarding post-homicidal behavior. We note that, prior to trial, defendant was housed in the Oakland County Jail. Arguably, defendant was available during permissible jail hours to meet with Dr. Walker. Moreover, trial counsel's performance is not to be examined through hindsight. . . .

> With regard to trial counsel's questioning of the experts, Michigan case law limits expert testimony on battered woman syndrome. In *People v. Christel*, 449 Mich. 578, 580; 537 N.W.2d 194 (1994), the Supreme Court held:

> > Generally, battered woman syndrome is relevant and helpful when needed to explain a complainant's actions, such as prolonged endurance of physical

abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse. If relevant and helpful, testimony regarding specific behavior is helpful. However, the expert may not opine whether the complainant is a battered woman, may not testify that defendant was a batterer or guilty of the instant charge, and may not comment on the complainant's truthfulness. Moreover, the trial court, when appropriate, may preclude expert testimony when the probative value of such testimony is substantially outweighed by the danger of unfair prejudice.

In light of the restrictions placed on expert testimony regarding battered woman syndrome, defendant's allegations are insufficient to overcome the presumption that trial counsel was effective.[9] *Tommolino, supra.* Decisions regarding the type of evidence to present and the decision to call and question witnesses are matters of trial strategy that will not be second guessed by this Court. *People v. Dixon*, 263 Mich. App. 393, 398; 688 N.W.2d 308 (2004). In the present case, it was irrelevant who conducted the testing because the experts were not permitted to testify regarding the specifics of the testing and that as a result of the testing that it was concluded that defendant was a battered woman.[]

_____

[9] In support of this claim of error, appellate counsel submitted a letter from Dr. Walker. Therein, the expert set forth what testimony she would have liked to present at trial. However, defense counsel fails to delineate what portions of [the] letter would have been admissible at trial in light of the restrictions imposed by *Christel, supra.* It is not the function of this Court to discover and rationalize the basis for a claim. . . .

*Seaman,* 2007 WL 466003, at *17.

### c. Michigan Case Law Regarding Battered Spouse Syndrome

At the time of Petitioner's trial, three Michigan cases generally governed the admissibility of expert testimony regarding battered spouse syndrome: *People v. Christel*, 449 Mich. 578, 537 N.W.2d 194 (Mich. 1995); *People v. Beckley*, 434 Mich. 691, 456 N.W.2d 391 (1990); and *People v. Wilson*, 194 Mich. App. 599; 487 N.W.2d 822 (1992). The Michigan Supreme Court specifically addressed the admissibility of such testimony in *Christel*, although the testimony was offered in a different context than in the present case. In *Christel*, the expert testimony on battered spouse syndrome was offered by the prosecution to explain the victim's actions. The defendant was

charged with first-degree criminal sexual conduct, breaking and entering an occupied dwelling with intent to commit criminal sexual conduct, and breaking and entering an occupied dwelling with intent to commit larceny. The victim testified that she had been involved in a sporadic romantic relationship with the defendant, but that the relationship had ended by the time of the assault. She testified that her relationship with the defendant had been consistently volatile. The defendant was often jealous and frequently beat her and then forced her to engage in intercourse. During cross-examination and the presentation of the defense, the victim was portrayed as a liar, perjurer and embezzler. The defense theorized that the victim concocted the rape because defendant had threatened to tell her employer that she was embezzling money from the company. *Id.* at 582-83, 537 N.W.2d at 197-98.

To rebut these claims, the prosecution called a psychologist trained in the field of battered spouse syndrome. The psychologist had not treated the victim or defendant. Therefore, his testimony was limited to generalities associated with battered spouse syndrome. He did not give an opinion as to whether the victim's behavior was consistent with that of a battered woman, whether she suffered from battered woman syndrome, or whether she was being truthful. He also did not give an opinion as to whether the defendant was a batterer. The defendant challenged the admission of this testimony on appeal. *Id.* at 585-86, 537 N.W.2d at 198-99.

The Michigan Supreme Court held that the evidence was not properly admitted because the necessary factual underpinnings for the expert testimony were lacking. The court concluded that because the complainant testified that the relationship ended before the assault and she did not hide, minimize, delay reporting, or recant the abuse, battered spouse syndrome testimony was not relevant to the case. *Id.* at 597, 537 N.W.2d at 204. The court held that the error was harmless.

While the Michigan Supreme Court held that the battered spouse syndrome testimony was improperly admitted under the facts presented in *Christel*, the court recognized that such testimony is generally admissible "when the witness is properly qualified and it is relevant and helpful in understanding an issue in the case." *Id.* at 600, 537 N.W.2d at 205. In the majority of cases, battered spouse syndrome testimony is offered by the defendant in a homicide case who is claiming self-defense. *Id.* at 589, 537 N.W.2d at 200. The court further recognized that "a majority of jurisdictions favor the admissibility of expert testimony on the issue of the battered woman syndrome when offered as a means of self-defense." *Id.*, *citing People v. Wilson*, 194 Mich. App. 599, 603, 487 N.W.2d 822 (1992). The Michigan Supreme Court analogized the admission of expert testimony on battered spouse syndrome to the admission of expert testimony regarding rape trauma syndrome in child abuse cases, which was ruled admissible subject to certain prerequisites in *People v. Beckley*, 434 Mich. 691, 456 N.W.2d 391 (1990).[2] The court extended the general holding in *Beckley* to expert testimony regarding battered spouse syndrome so that "the expert may, when appropriate, explain the generalities or characteristics of the syndrome." *Christel*, 449 Mich. at 591, 537 N.W.2d at 201. The court emphasized that "'the admissibility of syndrome evidence is limited to a description of the uniqueness of a specific behavior brought out at trial.'" *Id., quoting Beckley*,

---

[2] In *Beckley*, the Michigan Supreme Court held:

> Before permitting expert testimony, the trial court must find that the evidence is from a recognized discipline, as well as relevant and helpful to the trier of fact, and presented by a witness qualified by "knowledge, skill, experience, training, or education . . ."

*Christel*, 449 Mich. at 587, 537 N.W.2d at 199, *quoting Beckley*, 434 Mich. at 725, 456 N.W.2d 391. Further, a trial judge may exclude the testimony if the probative value of the syndrome evidence is substantially outweighed by the danger of unfair prejudice. *Id.*

434 Mich. at 725, 456 N.W.2d 391. The court did not address "whether or when the expert may testify about consistencies between the victim and an actual abuse victim," specifically reserving "that discussion for another day." *Id.* at 591 n.23; 537 N.W.2d at 201 n.23. But, the court noted that admissible expert testimony on battered spouse syndrome "[t]ypically . . . includes an explanation of the complainant denying or minimizing the abuse, delays in reporting, or subsequently recanting the abuse." *Id.* at 600, 537 N.W.2d at 205.

In *People v. Wilson*, 194 Mich. App. 599, 487 N.W.2d 822 (Mich. Ct. App. 1992), an opinion that pre-dated *Christel*, the Michigan Court of Appeals specifically considered whether an expert may address consistencies between a defendant claiming self-defense founded upon battered spouse syndrome and battered spouse victims generally. In *Wilson*, the defendant was charged with open murder in the shooting death of her husband. The defendant admitted to shooting her husband while he slept, but claimed that she did so in self-defense following two days of abuse and death threats and a long history of battery. The defendant sought a pretrial ruling on the admissibility of expert testimony regarding battered spouse syndrome. The trial court issued an opinion finding an expert in battered spouse syndrome could testify to the following: (1) a description of the general syndrome; (2) that the particular behavior of the spouse was characteristic of battered spouse syndrome victims generally; (3) whether the defendant suffered from the syndrome; and (4) whether the defendant's act was the result of the syndrome. *Id.* at 601, 487 N.W.2d at 823. The state filed an interlocutory appeal arguing that the trial court's ruling was too broad.

The court of appeals observed that the average juror is not familiar "with the complex behavior of a victim of the BSS." *Id.* at 603, 487 N.W.2d at 824. Accordingly, the court concluded that in cases where a defendant was claiming self-defense based upon battered spouse syndrome,

"expert testimony regarding the BSS will give the trier of fact a 'better understanding of the evidence or assist in determining a fact in issue.'" *Id.* at 604, 487 N.W.2d at 824-25, *quoting Beckley*, 434 Mich. at 711, 456 N.W.2d 391. As the *Christel* court would do several years later, the *Wilson* court looked to the Michigan Supreme Court's decision in *Beckley* for guidance as to the scope of the admissibility of expert testimony regarding battered spouse syndrome. The *Wilson* court concluded that testimony regarding whether the defendant suffered from the syndrome and whether her act was the result of the syndrome was not admissible. The court of appeals affirmed the trial court's decision that an expert in battered spouse syndrome should be permitted to testify "regarding a description of the general syndrome and that certain behavior of the defendant already in evidence is characteristic of battered spouse victims generally." *Id.* at 605, 487 N.W.2d at 825.

### d. Defense Counsel's Actions

Petitioner's trial attorney testified at the evidentiary hearing in this Court. He testified that the defense at trial was self-defense, based on battered spouse syndrome. He retained both Dr. Abramsky and Dr. Walker to testify at Petitioner's trial. He testified that he told Dr. Walker that "she could not give her final opinion that Nancy was an abused person," but, "[o]ther than that, there were no restrictions." Tr., 4/21/09 at 102. He reiterated his understanding as to the type of testimony allowed under Michigan law and the trial court's rulings as follows: "Ultimately in reading the cases I . . . conclu[ded] that . . . I could not ask my expert did you feel that Nancy was, in fact, an abused person. Beyond that, I don't think we were limited." *Id.* at 109. He testified both that Dr. Walker *could not* testify that Petitioner's behavior was consistent with characteristics of battered spouse victims and that she *could* give such testimony. *Id.* at 104-05. He further testified that he did not challenge Michigan case law on the admissibility of such testimony on the ground

that it violated a defendant's right to present a defense because he thought it would be futile to challenge a Michigan Supreme Court case, and because he thought raising such a challenge would delay trial, thereby putting Petitioner's already fragile emotional state in jeopardy of further deterioration.

The Court has the highest regard for the ability of Petitioner's trial attorney and his work in this case. His testimony at the evidentiary hearing was thoughtful, forthright, and the Court found him to be a credible witness. Counsel's good professional judgment was evident in his selection of Dr. Walker as an expert witness. This Court found her to be a clear, compelling, and persuasive witness. The state court record and counsel's testimony show that counsel devoted a great deal of time and thought to the preparation and trial of this case. Nevertheless, the Court finds that, in this case, counsel's failure to argue for the admissibility of the full breadth of expert testimony allowed under Michigan law, his failure to present that testimony, and his failure to arrange for Dr. Walker to personally interview and evaluate Petitioner satisfies the first prong of *Strickland*.

While no Michigan Supreme Court case has specifically addressed the admissibility of expert testimony in the context presented in this trial, *Beckley* and *Christel*, considered together, indicate that Michigan case law allows an expert witness to testify that a defendant's actions were consistent with someone suffering from battered spouse syndrome. In *Christel* the Michigan Supreme Court, while reserving the question of whether an expert could testify that a defendant's actions were consistent with that of victims of battered spouse syndrome, specifically relied on the reasoning set forth in *Beckley* to resolve the expert testimony questions before it. In *Beckley*, the Michigan Supreme Court held that, in the context of child sexual abuse cases, a party may question an expert "regarding the expert's familiarity or understanding of the victim's behavior at issue." *Beckley*, 434

Mich. at 727, 456 N.W.2d at 407. Further, that court held "the expert is allowed to define the victim's behavior in terms of the factual background that may have a relationship to those aspects of the victim's behavior which become evidence in the case." *Id.* The *Beckley* court noted a "meaningful distinction" between an expert opinion that a child was sexually abused, and "expert testimony that a child demonstrates behaviors commonly observed in the class of sexually abused children." *Id.* (citation omitted). As noted *supra*, the Michigan Court of Appeals, using the *Beckley* opinion as guidance, has held that an expert witness could testify that a defendant's behavior was consistent with behavior observed in battered spouses generally. *Wilson*, 194 Mich. App. at 605, 487 N.W.2d at 825.

Reasonable efforts to argue his client's case required defense counsel to attempt to introduce as much favorable testimony regarding battered spouse syndrome as allowed. It was the defense's only defense. Counsel failed to do so when he acquiesced in the trial court's evidentiary ruling. He did not argue that *Christel*, *Beckley*, and *Wilson* supported a broader scope of expert testimony, including testimony that Petitioner's actions were consistent with those of someone suffering from battered spouse syndrome. Instead, counsel limited the presentation of expert testimony to an explanation of the general syndrome rather than the broader scope of testimony permitted by state law. That is, counsel failed to relate the specifics of Petitioner's actions to the syndrome.

In support of this ineffective assistance of counsel claim, Petitioner attached to her brief on appeal to the Michigan Court of Appeals a letter from Dr. Walker detailing the testimony she would have given had she been permitted to testify more expansively, including how battered spouse syndrome related directly to Petitioner's behavior in this case. The state court, although finding counsel was not ineffective, failed to address whether, based upon this letter, testimony helpful to

the defense could have been elicited from Dr. Walker in accordance with Michigan precedent. The state court instead simply denied the claim, finding that counsel failed to delineate what information offered in Dr. Walker's letter would have been admissible under *Christel*. In fact, in her appeal brief, Petitioner specifically argued that Dr. Walker would have testified, and should have been permitted to testify, that Petitioner's behavior was consistent with someone suffering from battered spouse syndrome. The Michigan Court of Appeals, in denying this claim, failed to specifically address Petitioner's argument. The court simply quoted a passage from *Christel* and held that because of the restrictions based on battered woman syndrome, Petitioner's allegations could not overcome the presumption that her attorney was effective. The state court failed to address whether counsel attempted to elicit expert testimony as broad in scope as permitted by state law. Based upon the Michigan case law discussed herein, the Court finds that an attorney, acting reasonably in this case, would have pursued admission of a broader scope of expert testimony, and that the state court's conclusion to the contrary was an unreasonable application of *Strickland*.

Additionally, within the specific facts and circumstances presented in this case, an attorney acting within the wide range of reasonably competent assistance would have arranged for Dr. Walker to personally evaluate Petitioner, rather than relying on interviews and tests administered by Dr. Abramsky. In reaching a contrary result, the Michigan Court of Appeals reasoned that Petitioner was housed at the Oakland County Jail and, "[a]rguably, defendant was available during permissible jail hours to meet with Dr. Walker." *Seaman*, 2007 WL 466003, at *17. The state court's decision is unreasonable. Whether Dr. Walker *could* have met with Petitioner at the Oakland County Jail is not pertinent to this analysis. Trial counsel did not advise Dr. Walker to do so. An expert witness is not the individual charged with investigating and preparing a defense strategy. By

retaining an expert witness, an attorney does not cede responsibility for the scope of the expert witness's participation. Contrary to the Michigan Court of Appeals' implication, it is *defense counsel's* decision whether an expert witness should personally meet with a client and the fact that the client was arguably available to be visited by the witness is irrelevant to the evaluation of an attorney's decision in this regard.

During the evidentiary hearing in this court, defense counsel testified that he, Dr. Walker, and Dr. Abramsky agreed that Dr. Walker did not need to personally interview Petitioner because Dr. Abramsky already had interviewed her and would share all of the information he obtained with Dr. Walker. Dr. Walker testified that she did not conduct the normal forensic examination in this case that she typically conducts in similar cases. She did not do so because Petitioner's attorney advised her that Michigan law would not allow her to testify about Petitioner's state of mind, confining her instead to general information about battered spouse syndrome. Dr. Walker testified that if her testimony was limited to theories and the syndrome in general, rather than commenting on Petitioner's actions specifically, she did not need to conduct an interview. Dr. Walker is recognized as one of the foremost experts on battered spouse syndrome.[3] Defense counsel's failure to have her personally interview Petitioner was ineffective and the state court's finding to the contrary was an unreasonable application of *Strickland*.

The Court now turns to the second prong of *Strickland*, the prejudice prong. Because the state court found defense counsel's representation to be adequate, the state court never reached the

---

[3] *See, e.g., Fennell v. Goolsby*, 630 F. Supp. 451, 456 (E.D. Pa. 1985) (calling Dr. Walker the "research pioneer" in the field of battered woman syndrome); *In re Walker*, 147 Cal. App. 4th 533, 542 (Cal. Ct. App. 2007) ("a leading expert on the psychological effects of intimate partner battering"); *Weiand v. State*, 732 So. 2d 1044, 1048 (Fla. 1999) ("a nationally recognized expert on battered woman syndrome.").

issue of prejudice. Accordingly, this element of the *Strickland* analysis is reviewed *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo*."); *Eley v. Bagley*, 604 F.3d 958, 972 (6th Cir. 2010).

To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, considering "the totality of the evidence before the judge or jury." *Id.* at 695. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696; *see also Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004).

Dr. Walker testified in this Court that Petitioner's actions before, during, and after the killing were consistent with someone suffering from battered spouse syndrome. She explained many incidents that may have puzzled the jury. For instance, the jury heard evidence that Mr. Seaman was sleeping in the basement of the home in the weeks preceding his death. The jury heard evidence that Petitioner once wrote a letter to an area business accusing Mr. Seaman of being a pedophile. This evidence may have led the jury to believe that Petitioner was the aggressor or, at the very least, not someone experiencing prolonged and repeated abuse. Dr. Walker, however, explained that such actions, while seemingly at odds with the claims of frequent and long-standing abuse, were consistent with the actions of someone suffering from battered spouse syndrome. Additionally, the jury heard testimony that, despite claims that she had been abused for decades, Petitioner showed very little physical evidence of abuse. Dr. Walker testified that it is not uncommon for women who suffer from physical abuse at the hands of a spouse to exhibit little physical evidence of the abuse

visible to outsiders. She explained that abusers know where to hit the victims so as not to cause visible bruising and the victims become adept at covering evidence of abuse. Dr. Walker further testified that Petitioner's post-killing behavior – e.g., trying to find a substitute teacher, cleaning up the garage, covering the body – were all consistent with someone suffering from battered spouse syndrome.

Finally, Dr. Walker explained that Petitioner's flat, unemotional affect during trial was consistent with battered spouse syndrome. This testimony would have been critically important to the defense as Petitioner's affect could have negatively affected the jury's assessment of her credibility. Dr. Walker's testimony that such an affect supported rather than contradicted Petitioner's defense likely would have factored into the jurors' analysis of whether Petitioner's affect resulted from a lack of remorse for a premeditated, deliberate killing or from battered spouse syndrome brought on by years of abuse.

The jury was left to assess Petitioner's actions without the benefit of Dr. Walker's testimony evaluating her conduct in the context of battered spouse syndrome. Many of Petitioner's actions were likely difficult for jurors to understand without specific expert testimony. Respondent argues that Petitioner was not prejudiced by her attorney's failure to elicit a broader scope of expert testimony because defense counsel effectively linked the expert witnesses' testimony about battered spouse syndrome to the facts presented by Petitioner. Respondent maintains that defense counsel fully informed the jury of the syndrome and how it related to Petitioner's testimony. However, the attorney is neither a witness nor an expert. His closing arguments are not evidence and the jury was so instructed. Defense counsel's arguments are no substitute for expert testimony linking the syndrome to Petitioner's actions. The difference between an expert testifying that Petitioner's

conduct was consistent with the syndrome and her attorney presenting his opinion is significant and should not be minimized. As the Michigan Supreme Court recognized, "expert testimony is needed when a witness' actions or responses are incomprehensible to average people." *Christel,* 449 Mich. at 592, 537 N.W.2d at 202. Additionally, the failure to have Dr. Walker personally interview Petitioner allowed the prosecution to attack Dr. Walker's credibility, likely prompting the jury to question her testimony and draw negative inferences about the applicability of her testimony to this case.

The prosecution did not present overwhelming evidence Petitioner was guilty of first-degree premeditated murder. "All it would have taken is for 'one juror [to] have struck a different balance' between the competing stories." *Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007), *quoting Wiggins v. Smith*, 539 U.S. 510, 537 (2003). In fact, at least two reasonable jurists, the trial court judge and Judge Karen Fort Hood, who dissented from the Michigan Court of Appeals' decision, concluded that the prosecutor failed to prove premeditation and deliberation beyond a reasonable doubt. When the scales are so closely balanced, it would take little to tip them one way or another. Defense counsel's failure to argue for the admission of the full range of expert testimony admissible under Michigan law and his failure to have Dr. Walker personally interview Petitioner, combined with the lack of overwhelming evidence establishing that Petitioner acted with premeditation and deliberation, creates a reasonable probability that at least one juror would have struck a different balance had that additional testimony been presented. Accordingly, the Court finds that Petitioner has shown she was prejudiced by counsel's errors and a conditional writ of habeas corpus shall be granted.

## 2. Jury Instructions

Petitioner argues that her trial attorney was ineffective in failing to object to the jury instructions which she maintains were confusing, misleading, and incomplete. Specifically, Petitioner suggests that her attorney should have objected to the omission of the paragraph on justification, excuse, or mitigation found in Michigan's Criminal Jury Instructions for first-degree premeditated murder.

Petitioner raised this claim in her appeal to the Michigan Court of Appeals. The state court, while denying the jury instruction claim, failed to address the related ineffective assistance of counsel claim. The state court held that the jury instruction claim was waived because counsel failed to object, but never addressed whether counsel was ineffective for failing to do so. When a state court fails to consider an issue or does not specifically address whether the alleged error constitutes a denial of a habeas petitioner's federal constitutional rights, the deference due under 28 U.S.C. § 2254(d) does not apply, and habeas review of such a claim is *de novo*. *See Higgins v. Renico*, 470 F.3d 624, 630 (6th Cir. 2006). Thus, the Court reviews *de novo* Petitioner's claim that her attorney was ineffective in failing to object to the instructions.

The standard Michigan Criminal Jury Instruction for first-degree premeditated murder lists the first four elements of the crime: that the defendant caused the death of the victim, that the defendant intended to kill the victim, that the intent to kill was premeditated, and that the killing was deliberate. Mich. CJI2d 16.1(6) at 16-3 - 16-4. The instruction then includes the following bracketed instruction:

> [(6) Fifth, that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime.]

*Id.* The use note indicates:

Paragraph (6) may be omitted if there is no evidence of justification or excuse, and the jury is not being instructed on manslaughter or any offense less than manslaughter. Justification or excuse instructions may be inserted here, but they are more commonly given at a later time.

*Id.* at 16.1(6) n.4.

The commentary further provides:

[T]he committee bracketed paragraphs on justification, excuse, and mitigation for use in appropriate cases. Of course, when a defense of self-defense, accident or provocation is raised by the evidence, the prosecutor is required to disprove the defense beyond a reasonable doubt and the trial court is obliged to give the appropriate bracketed language.

Commentary following CJI2d 16.1.

Because Petitioner clearly presented a defense of self-defense, the trial court was obliged to give the bracketed language. The trial court did not do so.

Respondent notes that the trial court also provided the jury with a chart to help it differentiate between first-degree premeditated murder and second-degree murder. While the trial court transcript indeed indicates the jury would be provided with such a chart, the chart is not part of the record before this Court. The element chart found in CJI2d 16.6 includes the bracketed language found in CJI2d 16.1. Given that the trial court did not include the bracketed language in giving the CJI 2D 16.1 instruction, there is no reason to believe the language was included in the chart the jury received.

The Court must first decide whether the failure to request the instruction was deficient. As discussed *supra*, to establish deficient performance, Petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*. 466 U.S. at 688. In determining what is reasonable, the Court "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance . . . [and] that, under the

circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (internal citations omitted). Defense counsel testified that he had no strategic reason for not requesting the bracketed instruction and that it was simply an oversight on his part. Because Petitioner's defense rested entirely on her claim of justification, it was deficient for counsel to fail to request that the bracketed instruction be included.

The Court must next decide whether Petitioner was prejudiced by her attorney's failure to request the bracketed instruction. She was clearly entitled to the instruction. The Michigan Court of Appeals, in discussing the jury instruction claim (albeit not in the context of ineffective assistance of counsel), held that, viewing the instructions as a whole, the jury was aware that Petitioner's defense was that the killing was justified. The court recognized that the bracketed language may become mandatory depending upon the type of defense raised, but that it did not need to be given at the time the first-degree murder instruction was given. The Court does not review the state court's decision that, under Michigan law, the instruction, was not *required* to be given at the same time as the first-degree murder instruction. Instead, the Court considers whether Petitioner was prejudiced by her attorney's failure to request that the bracketed language be given at the same time as the first-degree murder instruction.

Although the trial court did not read the bracketed instruction, the trial court did, much later in the instructions, include the following instruction:

> [T]he defendant in this case claims that she acted in lawful self-defense. And I want you to know that a person has a right to use force or even take a life to defend herself under certain circumstances.
>
> And, if a person acts in lawful self-defense, her actions are excused and she [is] not guilty of any crime.

Tr., 12/13/04 at 148-49.

Respondent argues that this language adequately conveyed to the jury that, if they found Petitioner acted in lawful self-defense, she was not guilty of any crime. While the bracketed language would have been helpful to the jury in assessing the relationship between self-defense and the crime of first-degree murder, the trial court instructed the jury that a finding of lawful self-defense would require a not guilty verdict on all counts. Because the instructions, considered as a whole, communicated to the jury that justification was a complete defense, the Court finds that Petitioner was not prejudiced by the failure to include the bracketed language in the jury instructions.

### 3. Post-mortem Stab Wounds

Petitioner also argues that her attorney was ineffective in failing to present testimony from the autopsy report indicating that the stab wounds were inflicted post-mortem and that the first and incapacitating blow was struck with the blunt end of the hatchet. In support of her claim, Petitioner points to a one-page narrative report apparently prepared by an investigating officer who observed the autopsy of Mr. Seaman. The report indicates that Dr. Dragovic performed the autopsy and, according to the report's author, provided some explanation for what was determined during the autopsy. Dr. Dragovic indicated that blunt force trauma to the skull caused the death and the stab wounds were inflicted post-mortem. The author further indicated that Dr. Alexandrov also observed the autopsy and stated that it appeared that the skull was fractured by a flat object and not by a hatchet blade.

The Michigan Court of Appeals held that counsel was not ineffective in his handling of the medical examiner. The medical examiner testified at trial that he could not definitively state when the death occurred. It appeared that the hatchet-inflicted injuries occurred first and that, while the

blows to the side of the head may not have rendered the victim unconscious, the blows to the center of the head certainly would have done so. The medical examiner also testified stab wounds were inflicted when the victim was unconscious or dead. Based upon the medical examiner's testimony, the court of appeals held that counsel was not ineffective in failing to elicit testimony specifically as proposed by Petitioner.

At the evidentiary hearing in this Court, defense counsel offered the following rationale for his decision not to pursue at trial the issue of whether the stab wounds were post-mortem:

> As best I can recall Nancy explained to me that she didn't know if Mr. Seaman was dead from the first blow, the second blow, third blow, all she was thinking during the incident was if he gets his hands on me, I'm dead. So whether or not injuries were post-mortem or not, were not crucial to me in light of our defense that she wouldn't have known, had any way of knowing that, and that her continuing to strike him was based on the fact that she was in fear the whole time. Even after she knew he was dead, she felt he was going to come upstairs to the bedroom the next day and kill her. So it would be inconsistent for me to argue that some things were post-mortem, or weren't post-mortem. It wasn't relevant to us.

Tr., 4/21/09 at 110-11.

The Court finds that the state court did not unreasonably apply *Strickland* in holding that counsel was not ineffective in failing to elicit testimony regarding the contents of the one-page narrative report regarding the autopsy. Defense counsel's testimony at the evidentiary hearing established that his decision not to pursue this avenue of cross-examination was based upon a reasoned, carefully constructed trial strategy.

### 4. Photograph of Knife

Next, Petitioner argues that her attorney was ineffective in failing to present defense exhibit 45 to the jury. Petitioner argues that this exhibit is a photograph of the kitchen knife she maintained Mr. Seaman used to attack her, prompting her to fear for her life. Throughout the trial, the

prosecution mentioned that the knife had never been recovered, implying that the knife was a fabrication invented by Petitioner to justify her actions.

The Michigan Court of Appeals denied relief on this claim, noting first that Petitioner provided no authentication that the photograph was available at the time of trial or that it was part of the set that was used in the killing and later discarded. Additionally, the court held counsel was not ineffective in failing to introduce this photograph because the failure to admit it may have been a matter of trial strategy where "[t]he medical examiner may have examined the knife and concluded that [it] did not cause the puncture wounds, providing a basis to impeach defendant's testimony or statements to police." *Seaman*, 2007 WL 466003, at *16 n.7.

Petitioner has not shown that counsel was ineffective in failing to move for admission of the photograph. As the court of appeals noted, Petitioner has failed to show that the photograph was available during trial or to authenticate it in any other way. Additionally, Petitioner had an opportunity to question counsel at the evidentiary hearing in this Court and failed to explore what may have been his strategy for not presenting this photograph. Therefore, she has failed to sustain her burden of establishing ineffective assistance of counsel on this issue.

## 5. Toxicology Report

Petitioner also argues that her attorney was ineffective in failing to investigate the effects of drugs and alcohol reported in the toxicology report prepared in connection with the autopsy. The toxicology report showed a blood alcohol level of .07 and the presence of amphetamines. The medical examiner testified that the level of alcohol detected would have been augmented by decomposition and, while there clearly had been some alcohol consumption, it was not necessarily an amount as great as that reflected in the toxicology report. Additionally, the medical examiner

testified that the toxicology report indicated the presence of amphetamines.

The Michigan Court of Appeals denied this claim, finding that there was no indication that Mr. Seaman had taken medications at the time of his death and, consequently, a pharmacology expert would have shed little light on the victim's condition and the drug interactions. While there is some indication that Mr. Seaman had ingested alcohol and drugs some time prior to his death, Petitioner provides little beyond the toxicology report to support her claim that an expert could have aided the defense. She provides no expert affidavits or indication that expert testimony favorable to the defense could have been obtained. Moreover, she failed to question her defense attorney regarding his decision not to obtain an expert witness on this subject at the evidentiary hearing held in this Court. Therefore, Petitioner has failed to sustain her burden of establishing that the state court unreasonably applied *Strickland* as to this issue.

### 6. Failing to Object to Alleged Prosecutorial Misconduct

Petitioner next argues that counsel was ineffective in failing to object to several instances of prosecutorial misconduct. First, she alleges that counsel should have objected to an alleged violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). Second, she alleges that counsel should have objected to the prosecutor's portraying herself as an expert in battered spouse syndrome and, essentially, giving expert opinion testimony on the syndrome without being subject to cross-examination. As discussed *infra*, the *Doyle*-related claim is procedurally barred.

The prosecution's comments regarding her familiarity with battered spouse syndrome are discussed in detail *infra*. In sum, the Michigan Court of Appeals held that the prosecutor's remarks were not improper and this Court holds that the prosecutor's comments were unnecessary, but not sufficiently egregious or misleading to constitute prosecutorial misconduct. The comments were

isolated, not clearly intended to mislead the jury, and Petitioner was not prejudiced by the comments. Thus, habeas corpus relief is denied on this claim.

## B. Prosecutorial Misconduct

Petitioner next argues that she was denied a fair trial based upon pervasive and egregious prosecutorial misconduct. Specifically, Petitioner alleges the prosecutor committed misconduct in the following ways: (1) arguing in rebuttal that she removed a cover from the hatchet before striking Mr. Seaman; (2) questioning her about allegations that she attempted to poison Mr. Seaman, when the trial court judge had specifically excluded such testimony; (3) presenting herself as an expert on battered woman syndrome and using the prestige of her office to offer testimony about the syndrome; (4) questioning Petitioner about her religious beliefs; (5) shifting the burden of proof; (6) arguing that Petitioner's presence in the courtroom allowed her to tailor her testimony to be consistent with testimony already presented; (7) introducing an anonymous, unauthenticated letter; (8) referring to Petitioner as a "liar"; (9) violating the attorney/client privilege; (10) asserting motive with no basis in fact or record; (11) improperly commenting on witness credibility; and (12) misrepresenting facts in closing argument.

It is well established that prosecutors must "'refrain from improper methods calculated to produce a wrongful conviction.'" *United States v. Young*, 470 U.S. 1, 7 (1985), *quoting Berger v. United States*, 295 U.S. 78, 88 (1935)). "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). Prosecutorial misconduct may warrant habeas corpus relief only if the misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), *quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643

(1974). "To constitute a denial of due process, the misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *Byrd v. Collins*, 209 F.3d 486, 529-30 (6th Cir. 2000) (internal quotation omitted). The Court must examine "'the fairness of the trial, not the culpability of the prosecutor.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997), *quoting Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993).

The first question to consider is whether the prosecutor's conduct or remarks were improper. *See Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006). If they were, the Court must decide whether the improper acts were so flagrant as to warrant relief. *See id.* at 516. The Sixth Circuit applies a four-factor test to any inappropriate prosecutorial conduct to determine whether it was flagrant: "(1) whether the evidence against the defendant was strong, (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." *Id.* (citation omitted).

### 1. Argument Regarding Hatchet Cover

Petitioner suggests that the prosecutor improperly argued facts not in evidence when, in her rebuttal argument, she presented to the jury a hatchet with a cover on it and made the following argument:

> One last thought before I ask you to convict her of what she deserves. This is the hatchet that she stole, People's Exhibit 31. Notice something on it? A blade cover, a blade cover. You have to take the blade cover off to cause the injury that she did. Please don't give her any breaks. Convict her of one count of first degree murder.

*Seaman*, 2007 WL 466003, at *13.

After closing arguments and outside the presence of the jury, defense counsel objected to the prosecutor's argument because no evidence was presented at trial that the hatchet purchased by

Petitioner ever had a cover on it or that she removed a cover. Defense counsel moved for a mistrial. The trial judge denied the motion for a mistrial, but held that a curative instruction was necessary. The next morning, he gave the following curative instruction:

> If you remember yesterday during the closing arguments there was a reference made in rebuttal argument by the assistant prosecutor – she showed you a hatchet with a cover on it.
>
> There was no evidence in this case at all that any hatchet had any covers on them. And I told you before you're only to consider the evidence that was introduced into this trial and nothing else.
>
> So you're only to consider the Exhibits that were introduced.
>
> So what I want you to do is disregard the argument and the reference to a hatchet with a cover on it.

Tr., 12/14/04 at 10-11.

The Michigan Court of Appeals concluded that, because there was no testimony that the hatchet was purchased with a cover and because the prosecutor did not inquire of the medical examiner whether the same degree and type of physical injury would have been inflicted with or without a hatchet cover, the prosecutor improperly made a statement of fact that was not supported by the evidence. *Seaman*, 2007 WL 466003, at *13. Having concluded that the prosecutor acted improperly, the court of appeals then turned to the question whether Petitioner was denied a fair trial by the prosecutor's statement. The state court concluded that the curative instruction which specifically addressed the lack of any evidence to support the prosecutor's argument and instructed the jury to disregard the argument coupled with the presumption that jurors follow their instructions cured any error and that the prosecutor's argument did not deprive Petitioner of a fair trial.

The prosecutor's argument was clearly improper. Thus, this Court must consider whether the argument was so flagrant as to warrant habeas relief, applying the four-part test articulated in

*Slagle*.  The Court first considers whether the evidence against Petitioner was strong.  The prosecutor's argument about the blade cover goes to the elements of premeditation and deliberation. The evidence against Petitioner in this regard was not overwhelming.  While the purchase of the hatchet provided significant support for establishing premeditation and deliberation, there was also significant evidence presented, including testimony regarding battered spouse syndrome, which would tend to show that the murder was not premeditated.  Thus, the first element of this test favors Petitioner.  Second, the prosecutor's argument, without a curative instruction, would have tended to mislead the jury or prejudice the defendant.  However, the trial court's curative instruction was specific, clear, and unequivocal.  Although the instruction was not given until the following morning, deliberations did not commence until after the instruction was given.  The instruction not only told the jurors to disregard the argument but also specifically noted that no evidence whatsoever was presented at trial to support the prosecutor's argument.  In light of this instruction, the prosecutor's argument likely did not mislead the jury.  The prosecutor's argument was isolated. Finally, the trial court concluded that the prosecutor's remarks were not made with malice or ill intent.  This Court has no basis for doubting that conclusion.  Considering the foregoing factors, the Court concludes that the prosecutor's isolated statement was not so flagrant as to deny Petitioner her right to a fair trial.  Thus, the state court's conclusion was not contrary to or an unreasonable application of Supreme Court precedent.

### 2.  Comments Regarding Prosecutor's Knowledge About Battered Spouse Syndrome

Next, Petitioner argues that the prosecutor improperly presented herself as an expert on battered spouse syndrome and used the prestige of her office to offer testimony about the syndrome. Specifically, Petitioner objects to the following statement made by the prosecutor when she began

her cross-examination of Dr. Lenore Walker:

> As Head of the Domestic Violence Section of the Oakland County Prosecutor's Office, I've heard a lot about you.

Tr., 12/10/04 at 53.

Additionally, Petitioner objects to the prosecutor's closing statement in which she argued that Petitioner was not a battered woman and did not act in a manner consistent with how a battered woman would act. Petitioner argues that the prosecutor, throughout her closing argument, essentially testified as an expert witness in battered spouse syndrome based upon her experience as head of the Domestic Violence Section.

The Michigan Court of Appeals held that the prosecutor's conduct in this regard was not improper, stating in relevant part:

> In light of this expansive delineation of Dr. Walker's qualifications and experience, it is logical that the head of the prosecutor's domestic violence unit would be familiar with Dr. Walker and her work. [] It is implausible that the statement "head of the domestic violence unit" would cause the jury to disregard the extensive training and qualifications of Dr. Walker. The statement alone did not impart that the prosecutor herself was an expert. Prosecutorial comments must be read as a whole and evaluated in light of the defense arguments and the relationship they bear to the evidence at trial. . . . The statement made by the trial prosecutor did not divulge any special knowledge or off the record experience that would have caused the jury to disregard the qualifications of Dr. Walker and the high regard in which she was held by various entities. In light of the facts of the case, the remarks were not improper and did not impart special knowledge or invoke the prestige of the office.

*Seaman*, 2007 WL 466003, at *14.

This Court agrees that the prosecutor's comment did not constitute misconduct. Though it was a gratuitous comment, it was not clearly improper. It would not have persuaded the jury that the prosecutor was an expert in battered spouse syndrome, nor did it serve to denigrate the qualifications of the defense witness. Additionally, the prosecutor's closing statement simply argued

that the evidence presented showed that Petitioner's actions were not consistent with those of someone suffering from battered spouse syndrome. She did not portray herself as an expert in battered spouse syndrome. Habeas relief is denied on this claim.

### 3. Questions Regarding Religious Beliefs

Petitioner next argues that the prosecutor committed misconduct when she questioned Petitioner about her religious beliefs. On direct examination, Petitioner testified that she was raised in a Catholic family and was raised to respect the idea that marriage is a sacrament. Her marital vows were also cited as a reason she stayed in the marriage despite the abuse. On cross-examination, the prosecutor asked Petitioner whether she was married in a Catholic church, when the last time was that she attended church, the name of her priest, and whether she was familiar with the Sixth Commandment.

Michigan has both a statute and an evidentiary rule relating to this issue. Mich. Comp. Laws § 600.1436 provides in part that "[n]o witness may be questioned in relation to his opinions on religion." Similarly, Michigan Rule of Evidence 610 provides that "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by means of their nature the witness' credibility is impaired or enhanced." The purpose of such evidentiary rules "is to strictly avoid any possibility that jurors will be prejudiced against a certain witness because of personal disagreement with the religious views of that witness." *People v. Jones*, 82 Mich. App. 510, 516, 267 N.W.2d 433 (Mich. Ct. App. 1978).

The Michigan Court of Appeals held that, under Michigan law, questions about religious beliefs are not improper when a defendant introduces the matter of her religious beliefs into evidence. *Seaman*, 2007 WL 466003, at *15, *citing People v. Umerska*, 94 Mich. App. 799, 806,

289 N.W.2d 858 (Mich. Ct. App. 1980). The state court further held:

> Counsel may not have the benefit of response to questions asked by him which are designed to show the favorable side of defendant's beliefs but deny the people the right to ask any questions at all on the testimony introduced. . . . In light of defendant's initial introduction of her religion into evidence at trial, the prosecutor was entitled to explore the area and such action does not constitute misconduct.

*Id.* (internal quotation omitted).

Petitioner introduced the topic of her religious beliefs on direct examination. She referenced her religious beliefs in the context of describing her upbringing and her beliefs on the sanctity of marriage. Her respect for her marital vows was also referenced as a possible explanation why she did not leave her troubled marriage. This Court agrees with the state court that Petitioner opened the door to the prosecutor's questions on religion and that it would be unfair to allow Petitioner to use her religion to explain her actions, but not allow the prosecutor at least some cross-examination on this issue.

Even allowing for some cross-examination on the topic of religion, the Court finds that the prosecutor's question whether Petitioner was familiar with the Sixth Commandment ("Thou shall not kill") was improper. However, it did not serve to deprive Petitioner of a fair trial. First, the prosecutor informed Petitioner that the Sixth Commandment was "Thou shall not take the Lord's name in vain." Thus, jurors may not have been aware of the actual Sixth Commandment. Second, although clearly not accidental, the reference to the commandment was brief and isolated. Third, while the evidence of premeditation and deliberation was not strong, this isolated improper comment is not reasonably likely to have misled the jury. Thus, the Court finds that the holding that the prosecutor's questions regarding religious issues did not deny Petitioner a fair trial were not contrary to or an unreasonable application of Supreme Court precedent.

## 4. Burden of Proof

Petitioner argues that the prosecutor improperly shifted the burden of proof in her closing

statement by arguing as follows:

> Let's talk about her witnesses. All of her witnesses – not one came forward, not a
> one, before this happened, and not a one came forward after it happened. Not a one.
>
> Wouldn't return calls. Wouldn't talk to law enforcement. They didn't say,
> "Detective Patterson, I have this important information." Oh, no. Everybody saved
> this for you guys.

Tr., 12/13/04 at 119.

The Michigan Court of Appeals held that the prosecutor's argument was not improper,

stating in relevant part:

> The prosecutor inquired why witnesses did not return telephone calls from the
> prosecutor's investigator. The responses provided by the witnesses varied. It was
> reported that some never received a message to return a call. To some witnesses, it
> was unclear if the caller was an investigator or a member of the press seeking
> information. Some witnesses, indicated that they had previously spoken to police.
> On cross-examination, the defense established that they never prevented their
> witnesses from speaking to police and never asked the witnesses to ignore calls from
> the prosecutor's office. Perhaps of greater importance, there was never any
> indication that these witnesses had information, *i.e.*, were *res gestae* witnesses, such
> that they should come forward. These witnesses merely provided underlying
> foundation testimony regarding the marital couple's relationship. This testimony had
> no direct bearing on the charged crime itself because the only surviving person who
> was aware of the circumstances that transpired in the garage was defendant. The
> prosecutor did not improperly shift the burden of proof with this line of questioning,
> but was exploring whether the witnesses were biased in favor of defendant.

*Seaman*, 2007 WL 466003, at *15.

It is improper for a prosecutor to shift the burden of proof to a defendant. *See United States*

*v. Clark*, 982 F.2d 965, 968-69 (6th Cir. 1993). In this case, the prosecutor's argument reviewed as

a whole and in the context of the entire trial was, as the court of appeals held, an attempt to explore

possible witness biases. To the extent that the prosecutor's remarks caused any confusion, the jury instructions clearly set forth the burden of proof. Habeas relief is denied on this claim.

### 5. Comments on Petitioner's Opportunity to Hear Other Testimony Before Testifying

Next, Petitioner argues that the prosecutor committed misconduct when she argued that Petitioner's presence in the courtroom allowed her to tailor her testimony to be consistent with testimony already presented. Although this claim was raised by Petitioner on direct appeal, the Michigan Court of Appeals failed to specifically address it. As noted above, when the state court does not address the merits of a claim, AEDPA deference does not apply and a federal court reviews the issue *de novo*. *See, e.g., Maples, supra*.

The United States Supreme Court has held that a prosecutor may properly comment that a defendant had the opportunity to hear all other witnesses testify before the defendant is called to testify and that the defendant therefore could tailor his or her own testimony accordingly. *See Portuondo v. Agard*, 529 U.S. 61 (2000). In *Portuonda,* the Supreme Court held, in pertinent part:

> [W]e see no reason to depart from the practice of treating testifying defendants the same as other witnesses. A witness's ability to hear prior testimony and to tailor his account accordingly, and the threat that ability presents to the integrity of the trial, are no different when it is the defendant doing the listening. Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate – and, indeed, given the inability to sequester the defendant, sometimes essential – to the central function of the trial, which is to discover the truth.

*Id.* at 73.

Since the Supreme Court has approved of the type of argument made by the prosecutor in this case, Petitioner is not entitled to habeas relief with respect to this claim.

### 6. Introduction of Unauthenticated Letter

Petitioner argues that the prosecutor committed misconduct by introducing an anonymous,

42

unauthenticated letter. As discussed *infra*, this claim is procedurally defaulted.

### 7. Calling Petitioner a "Liar"

In her next claim of prosecutorial misconduct, Petitioner argues that the prosecutor improperly and repeatedly called her a liar in closing argument.

Even though "[a] prosecutor should not give his own opinion as to the credibility of witness[,] . . . this does not mean that the prosecution cannot attack the defendant's credibility or even assert that the defendant is lying." *West v. Bell*, 550 F.3d 542, 565 (2008) (internal citations omitted). A prosecutor may argue from the facts that a witness is (or is not) worthy of belief. *See Portuondo*, 529 U.S. at 69. "Where there is conflicting testimony, it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying." *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996). The prosecutor's references in this case to Petitioner as a liar were permissible attacks on her credibility. Petitioner has failed to demonstrate that the prosecutor's argument was improper or that it rendered her trial fundamentally unfair.

### 8. Attorney-Client Privilege

Next, Petitioner argues that the prosecutor committed misconduct by violating her attorney-client privilege when the prosecutor improperly questioned her and her son about conversations with her attorney.

The Michigan Court of Appeals denied this claim as follows:

The brief in support of the issue only addresses the concern in three sentences. Review of the record reveals that the allegations are not substantiated by the page references. Further, authority in support of this issue is not provided. A party may not merely announce an issue and expect this Court to rationalize the basis for the claim, but instead may consider the issue abandoned.

*Seaman,* 2007 WL 466003, at *14 n.5.

The Court has reviewed the supporting page references cited by Petitioner in her habeas petition. The transcript shows no attempted violation of the attorney-client privilege. The prosecutor cross-examined Petitioner about whether she met with her attorney and whether they discussed her case, but did not inquire into the substance of their conversations. Additionally, the prosecutor's cross-examination of Petitioner's son explored what Petitioner relayed to her son. Such questioning did not violate the attorney-client privilege. Habeas relief is denied on this claim.

### 9. Prosecutor's Argument Regarding Motive

Petitioner argues that the prosecutor asserted a motive with no factual basis in the record. Petitioner presents no further argument in support of this claim other than citation to two pages from the transcript of the prosecutor's closing argument. The Court has reviewed the closing argument, with particular attention to the sections specifically cited by Petitioner, and finds that the prosecutor's argument was an appropriate comment on the evidence presented and asked only for the jury to make reasonable inferences based upon the evidence.

### 10. Commenting on Witness' Credibility

Petitioner next argues that habeas relief is warranted because the prosecutor improperly commented on the credibility of defense witness Dr. Abramsky. As with her previous claim, the entirety of Petitioner's argument is a single sentence asserting the claim and citations to two separate portions of the trial transcript. The portions of the trial transcript cited by Petitioner show vigorous cross-examination by the prosecutor. The prosecutor's questions are direct and clearly designed to limit the benefit to the defense derived from Dr. Abramsky's testimony. This is proper cross-examination.

### 11. Alleged Misrepresentations of Facts

Petitioner argues that the prosecutor misrepresented facts in her closing argument and lists seven specific alleged misrepresentations. Although this claim was raised on direct appeal, the Michigan Court of Appeals failed to specifically address it. Therefore, the Court conducts a *de novo* review.

"Even if the prosecution's conduct was improper or even universally condemned," a federal court on habeas review may grant relief only if "the statements were so flagrant as to render the entire trial fundamentally unfair." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006). None of the seven instances of alleged misrepresentations or misstatements of facts in this case were "so pronounced and persistent that [they] permeate[d] the entire atmosphere of the trial." *Pritchett,* 117 F.3d at 964 (internal quotation omitted). Additionally, the trial court correctly cautioned the jurors that what the lawyers said was not evidence. *See United States v. Carter*, 236 F.3d 777, 787 (6th Cir. 2001) ("Ordinarily, a court should not overturn a criminal conviction on the basis of a prosecutor's comments alone, especially where the district court has given the jury an instruction that may cure the error."). Petitioner presents no evidence to suggest that the prosecutor intentionally made any improper statements. The Court therefore concludes that no misconduct occurred in this regard.

### 12. Alleged *Doyle* Violation

Finally, Petitioner argues that the prosecutor violated her due process rights under *Doyle*, 426 U.S. 610. As discussed *infra*, this claim is procedurally defaulted.

### C. State Court's Denial of Evidentiary Hearing

In her first claim for habeas relief, Petitioner argues that the state court violated her right to due process when it denied her request for an evidentiary hearing pursuant to *People v. Ginther*, 390

Mich. 436 (1973), on her ineffective assistance of counsel claims. *Ginther* does not confer an absolute right to an evidentiary hearing in all cases where a defendant alleges ineffective assistance of counsel, and "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). *See also Litteral v. Palmer*, No. 08-CV-11172, 2010 WL 2633595, at *14 (E.D. Mich. June 29, 2010). Therefore, this claim is not cognizable on habeas corpus review.

### D. Great Weight of the Evidence

Petitioner next argues that she is entitled to habeas relief because the verdict was against the great weight of the evidence where sufficient evidence of premeditation and deliberation was not presented. However, a federal court lacks the power to grant habeas relief on this basis. *See Cukaj v. Warren*, 305 F. Supp.2d. 789 (E.D. Mich. 2004), *citing Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985)); *Crenshaw v. Renico*, 261 F. Supp.2d 826, 834 (E.D. Mich. 2003); *Dell v. Straub*, 194 F. Supp.2d 629, 648 (E.D. Mich. 2002)). This is because a great weight of the evidence claim "is not of constitutional dimension, for habeas corpus purposes, unless the record is so devoid of evidentiary support that a due process issue is raised." *Dell*, 194 F. Supp.2d. at 648. Therefore, the Court construes the petition as asserting a claim that insufficient evidence was presented to support the conviction.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). On direct review, review of a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In the

habeas context, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006), *quoting Jackson*, 443 U.S. at 324 n.16. "A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003), *citing Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). "The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim." *Matthews*, 319 F.3d at 788-89.

The Michigan Court of Appeals, in reversing the trial court's sentence reduction and reinstating the first-degree murder conviction, held that the finding of premeditation and deliberation was not against the great weight of the evidence. The trial court reasoned, in relevant part:

> [W]e conclude that there was more than ample evidence supporting the jury's finding of first-degree, premeditated murder. Case law provides that premeditation may be established by the time it takes for a "second look." *People v. Gonzales*, 468 Mich. 636, 641; 664 N.W.2d 159 (2003). There is no magic minimum time period for reflection or a "second look," and depending on the circumstances, only a few seconds can be sufficient time. . . . Here, evidence was presented showing that defendant inflicted 16 blows with a hatchet and 22 stab wounds with a knife. The time between defendant dropping the hatchet, and then picking up the knife and repeatedly stabbing her husband, was more than sufficient time for defendant to have taken a "second look."
>
> An additional valid legal theory of premeditation was that there was marital discord, that defendant went to the store and bought the hatchet (at a strange day and time), came home and killed Mr. Seaman. . . . This was certainly a plausible theory, as that is in fact what occurred. The only dispute was whether defendant purchased the hatchet for landscaping or to murder her husband. The jury believed it was for the latter, which had support in the evidence.
>
> Michigan law also establishes that subsequent evidence of concealment may be used as a factor when determining premeditation and deliberation. . . . Here, there was ample evidence presented to the jury to conclude defendant covered up the crime by hiding the body, cleaning up the murder scene, and lying about his whereabouts. Hence, there were at least three legal grounds supported by evidence that justified the jury's finding of first-degree premeditated murder.

*Seaman*, 2007 WL 466003, at *7.

The Michigan Court of Appeals' discussion of the evidence supporting a finding of premeditation and deliberation in the context of the great weight of the evidence claim is useful in analyzing the satisfaction of this element in the context of the sufficiency of the evidence. While reasonable jurists could have disagreed and have disagreed about whether premeditation and deliberation were established, a reasonable trier of fact could have found beyond a reasonable doubt under the circumstances that they were established. Petitioner, therefore, is not entitled to habeas relief on this claim.

### E.  Procedurally Defaulted Claims

The following claims were presented by Petitioner for the first time in her motion for relief from judgment filed in the trial court: (1) limitations placed on testimony regarding battered spouse syndrome violated right to present a defense; and (2) prosecutor committed misconduct by (a) violating the trial court's ruling regarding admissibility of an attempted poisoning of Mr. Seaman by Petitioner; (b) commenting on witnesses' credibility; (c) misstating the law of intent, and (d) introducing an unauthenticated letter. Petitioner's claims that the limitations placed on battered spouse syndrome testimony violated the Equal Protection Clause, that the prosecutor violated *Doyle* and that counsel was ineffective for failing to object to the alleged *Doyle* violation were presented for the first time in her application for leave to appeal to the Michigan Supreme Court.

A prisoner challenging her confinement by way of a habeas corpus petition must exhaust her state court remedies prior to seeking federal habeas corpus relief by fairly presenting the substance of each federal constitutional claim in state court. *See* 28 U.S.C. § 2254(b); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). To be properly

exhausted, each claim must have been "fairly presented" to both the state court of appeals and the state supreme court. *See Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009). A prisoner "'fairly presents' his claims to the state courts by citing a provision of the Constitution, federal decisions using constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns." *Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir. 1993). The petitioner bears the burden of showing that state court remedies have been exhausted. *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

The habeas claims raised for the first time in Petitioner's motion for relief from judgment have never been presented to the Michigan Court of Appeals or the Michigan Supreme Court. Those claims, therefore, are unexhausted. Petitioner's Equal Protection Clause claim and her *Doyle*-related claims were presented for the first time in her application for leave to appeal to the Michigan Supreme Court. "[A]n issue has not been fairly presented when it is raised for the first time to the Michigan Supreme Court, and that court declines to exercise its right to discretionary review." *Warlick v. Romanowski*, No. 09-1199, 367 F. App'x 634, 643 (6th Cir. Mar. 3, 2010), *citing Farley v. Lafler*, 193 F. App'x 543, 549 (6th Cir. 2006). These claims, therefore, are also unexhausted.

No state court remedy is available to Petitioner because she already has filed one motion for relief from judgment in the state trial court and, pursuant to Mich. Ct. R. 6.502(G), she may not file a successive motion. Additionally, the time for filing an application for leave to appeal the trial court's denial of her motion for relief from judgment has expired. Where a petitioner "fails to present his claims to the state courts and . . . is barred from pursuing relief there, his petition should not be dismissed for lack of exhaustion because there are simply no remedies available for him to exhaust." *Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995). However, a petitioner will not

be allowed to present unexhausted claims unless she can show cause to excuse her failure to present them in the state courts and actual prejudice to her defense at trial or on appeal.

It is unclear whether Petitioner asserts ineffective assistance of appellate counsel as cause to excuse the procedural default of these claims. Assuming she does, ineffective assistance of trial and appellate counsel would not excuse Petitioner's failure to present these claims on collateral review in state court. *Hannah*, 49 F.3d at 1196. *See also Guilmette v. Howes*, __ F.3d __, No. 08-2256, 2010 WL 4117281, at *4 (6th Cir. Oct. 21, 2010) (holding that a claim of ineffective assistance of appellate counsel is properly exhausted when it is raised at the first opportunity to do so – in a post-conviction motion for collateral relief in state court). Thus, these claims are procedurally defaulted and barred from review unless Petitioner can establish that a constitutional error resulted in a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 321 (1995).

The Supreme Court explicitly has tied the miscarriage of justice exception to procedural default to a petitioner's innocence. *Id.* Thus, Petitioner must assert a constitutional error along with a claim of innocence. To make a showing of actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt." *Id.* at 327. The Court further explained this standard as follows:

> The . . . standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal to consider the probative force of relevant evidence that was either excluded or unavailable at trial. . . . The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including . . . evidence tenably claimed to have been wrongly excluded or to have become available only after trial.

* * *

50

> . . . [A]ctual innocence does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

*Id.* (internal quotation omitted).

Petitioner fails to present new, reliable evidence in light of which no reasonable juror would have found her guilty. Therefore, these claims are procedurally barred.

### F. Cumulative Effect of the Alleged Errors

Finally, Petitioner argues that the cumulative effect of the alleged errors denied her her right to a fair trial. This claim has no merit because "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief," *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), *opinion corrected on denial of reh'g*, 307 F.3d 459 (2002), *and cert. denied*, 538 U.S. 947 (2003), and the Court has found that counsel's ineffectiveness rather than any cumulative error violated Petitioner's constitutional rights. Therefore, it cannot be said that the state court's judgment denying this claim was contrary to any Supreme Court decision so as to warrant habeas relief under the AEDPA.

### V. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009, requires that a district court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

. . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11, Rules Governing Section 2255 Proceedings.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997). To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted).

The Court finds that reasonable jurists could find its resolution of the following claims to be debatable or wrong: that counsel was ineffective in failing to object to the jury instructions, that the prosecutor committed misconduct when she argued that Petitioner removed the hatchet cover, and that the prosecutor committed misconduct when she questioned Petitioner regarding her religious beliefs. Accordingly, the Court will grant a certificate of appealability on these claims.

With respect to the remaining claims, the Court finds that reasonable jurists would not debate that this Court correctly denied each of these claims. Therefore, the Court will deny a certificate of appealability on the remaining claims.

## VI. Conclusion

For the foregoing reasons, IT IS ORDERED that the petition for a writ of habeas corpus is conditionally granted.

Unless a date for a new trial is scheduled within 120 days, Petitioner must be unconditionally released.

 S/Bernard A. Friedman
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

DATED:  October 29, 2010
         Detroit, Michigan

I hereby certify that a copy of the foregoing document
was served upon counsel of record by electronic and/or first-class mail.

S/Carol Mullins
Case Manager to Judge Friedman